UNITED STATES of America, Plaintiff,

v.

Mrs. Theodore PETER, Ernest R. Baron, Stanley A. Baron, Mrs. Hazel Baron, Mr. and Mrs. John E. Cleland, Mrs. Rosa Fauntleroy, John H. Lemmon and/or Lemmon's Mattress Works, Estate of Emily Baron, and John Doe, Defendants.

Civ. A. No. 8446.

United States District Court E. D. Louisiana, New Orleans Division.

Nov. 27, 1959.

Lloyd C. Melancon, Asst. U. S. Atty., New Orleans, La., for the United States.

Stanley A. Baron, New Orleans, La., for Mrs. Theodore Peter, Ernest R. Baron, Mrs. Hazel Baron, the Estate of Emily Baron and S. A. Baron.

Guy L. Deano, Jr., New Orleans, La., for Mr. and Mrs. John E. Cleland.

J. SKELLY WRIGHT, District Judge.

The setting of this drama is the Lemmon Mattress Works, Hammond, Louisiana. Miss Emily Baron, a local recluse, died in 1957 at the age of 82. A year later her mattress, after being locked up in her room since her death, is sold and sent to the Mattress Works for renovation. After the mattress ticking is removed and the cotton contents processed through the chopping machine, they are placed in the deodorizer box. There the cotton is subjected to an air blast which blows into the air $22,200 in gold certificates.

Emily Baron was one of three children of Lucian Sebastian Baron, a wealthy resident of south Louisiana. Mr. Baron died in 1928. Up to the time of his death he was taken care of by his spin-

ster daughter, Emily. A short time after her father's death, Emily moved in with her brother in his family home near New Orleans. She bought a mattress, the mattress in suit. She used the mattress in her brother's home until 1932 when she and her brother's family moved to Covington, Louisiana. She took the mattress with her.

Emily had built on her brother's acreage in Covington a separate house for her occupancy 30 feet from the home in which her brother and his family lived. In addition to the usual locks on the doors of this house, Emily also had a special lock placed on the door of her bedroom, for it was in that bedroom she kept the mattress.

Emily seldom left her little house and she allowed no one to enter her bedroom except she be present. She ordered her clothes by catalog and kept dormant bank accounts in several banks. As the years went by, Emily gradually lost her sight until at the end she was totally blind. On her death she left no will. Her bedroom was searched and $26,000 in Government bonds and $2,000 in cash was found in scattered places around the room. No one looked in the mattress.

Emily's legal heirs, one set of claimants here, were judicially placed in possession of all property of which she died possessed. In disposing of her property of little value, her mattress was sold for $2.50 to Mr. and Mrs. John E. Cleland,

another set of claimants in these proceedings. It was the Clelands who had the mattress picked up from the bedroom of Emily's old house and brought to the Mattress Works. They never saw their purchase. At the Mattress Works the mattress ticking was stripped off and the cotton contents processed as heretofore described. The gold certificates were found by Mr. John H. Lemmon, in charge of Lemmon's Mattress Works. Mr. Lemmon refused to make a claim for the gold certificates. He testified that they do not belong to him and that he does not want them.

The United States has brought this interpleader action,[1] claiming the gold certificates, but agreeing to pay the rightful owner thereof their face value. See 31 C.F.R. 53.1. Only the heirs of Emily Baron and the Clelands have made a claim. The Clelands originally contended that when they purchased the mattress for $2.50, ownership of the $22,200 in gold certificates contained therein was transferred to them. When it appeared that this contention was obviously without merit,[2] the Clelands decided that the gold certificates were in fact a treasure trove, and that, since the treasure was found in their property, it belonged to them. As authority for this lately conceived contention they cite LSA–Civil Code, Article 3423.[3] The heirs of Emily Baron rely on LSA–Civil Code, Article 3422,[4] maintaining that the certificates

1. 28 U.S.C. § 1345.

2. It was unlawful to acquire gold certificates after August 28, 1933. A transfer prohibited by law is void. LSA–C.C., Articles 12, 1764, 1779, 1885, 1891, 1892, and 1893. Also LSA–C.C., Art. 1959, reads:
"However general be the terms in which a contract is couched, it extends only to the things concerning which it appears that the parties intended to contract."

3. LSA–C.C., Art. 3423, reads:
"Although a treasure be not of the number of the things which are lost or abandoned, or which never belonged to anybody, yet he who finds it on his own land, or on land belonging to nobody, acquires the entire ownership of it; and should

such treasure be found on the land of another, one-half of it shall belong to the finder and the other half to the owner of the soil.
"A treasure is a thing hidden or buried in the earth, on which no one can prove his property, and which is discovered by chance."

4. LSA–C.C., Art. 3422, reads:
"If he, who has found a movable thing that was lost, having caused it to be published in newspapers, and having done all that was possible to find out the true owner, can not learn who he is, he remains master of it till he, who was the proper owner, appears and proves his rights; but if it be not claimed within ten years, the thing becomes his property, and he may dispose of it at his will."

were merely lost chattels belonging to their Aunt Emily and that, as her heirs, they own them.

The law of treasure trove has been the subject of much exhilarating conjecture but very little use. Under the early English common law, treasure belonged to the finder. 1 Bl.Comm. (Cooley's 4th ed. 1899) 296. The king soon took care of this detail, however, by promulgating a statute declaring that all treasure belonged to the royal sovereign. 4 Edw. I, c. 2, 1 Pick.Stat. at L. 112 (1276). No subsequent sovereign has seen fit to have the law changed, so even today discovered treasure belongs to the monarch. See Emden, The Law of Treasure Trove, Past and Present, 42 L.Q.Rev. 368, 379 (1926).

■ The Code Napoleon, 1804, Article 716, on which Louisiana Civil Code is largely based, provides that: "The ownership of a treasure belongs to the person who finds it * * *." But that same article provides further that: "A *treasure* is a thing hidden or buried in the earth, on which no one can prove his property, * * *." The treasure trove article in the LSA–Civil Code, Article 3423, is but a restatement of the Code Napoleon. While the language may be garbled to some extent in translation, it is clear that under Louisiana Civil Code as well as under the Code Napoleon the finder of treasure did not own it. He became the owner only if no one could prove that the treasure was his property.

■ The other Louisiana Civil Code article of relevance is Article 3422 which is entitled "Finding lost things," which provides that the finder of a lost article, the ownership of which is unknown, "remains master of it till he, who was the proper owner, appears and proves his right; * * *." This article has no counterpart in the Code Napoleon. No useful purpose will be served by distinguishing situations intended to be covered by this article from those under Article 3423,[5] because it is clear to this Court that these gold certificates belonged to Aunt Emily and can now be rightfully claimed by her legal heirs under either article.

While ownership of the gold certificates in Emily Baron has not been proved to a mathematical certainty, the preponderance of the evidence shows that in all probability it was Emily who opened the mattress covering sufficiently to insert the certificates inside and crudely sewed the opening up. Emily coveted this mattress, as she did all of her possessions, from the time she first purchased it. When she first came to live with her brother after her father's death, there was a child in diapers in the family. At the time the air blast blew the gold certificates out of the deodorizer box, it also blew bits of diaper into the air, indicating the possibility that the diaper, before being chopped in the chopping machine, was the wrapper on the certificates. Not long after Emily presumably placed the certificates in the mattress, it became illegal to have gold certificates in one's possession. 33 C.F.R. 53.1. This may explain why Emily allowed her cache to remain in the mattress. It is also conceivable that as the years went on she forgot where she placed the certificates or perhaps even that she had them.

It is true that much of the above appears to be speculation. But considering all the circumstances of this case, and the obviously credible testimony of the members of the Baron family, carefully delineating the eccentricities of this recluse, this Court has the abiding conviction that the certificates did belong to Emily Baron and that her rightful heirs are entitled to their currency equivalent.

Judgment accordingly.

5. Actually, LSA–C.C. Articles 3422 and 3423 merely show that Louisiana has followed the trend toward merging the law of treasure trove with the law of lost property. See Reisman, Possession and the Law of Finders, 52 Harv.L.Rev. 1105, 1112 (1939).